Jeff Sandberg for the United States. Debtors in Chapter 11 bankruptcy cases are required to pay quarterly fees in order to fund federal bankruptcy administration. At issue is whether these debtors were responsible starting in 2018 for paying the fees specified by Congress in a 2017 amendment. And the government is here before you on appeal because the bankruptcy court erroneously held that the 2017 fee amendment was unconstitutionally non-uniform because the statute was not implemented on the same date in all 94 judicial districts. The court also held that the 2017 amendment, which provides for future fee increases, was somehow retroactive and that that retroactivity was unconstitutional. I'd like to begin with the uniformity issue. And with the court's indulgence, I'd like to very quickly just identify the four different reasons why the uniformity claim fails, and then I'd be happy to turn to whatever the court's most interested in. The four reasons are, first, the term uniform in the bankruptcy clause, which is primarily a grant of authority to Congress to the extent that it's also a restriction on Congress's authority. That restriction applies only to the subject matter of bankruptcy and not to laws setting up the machinery of bankruptcy administration. Second, even if uniformity extends beyond the subject matter of bankruptcy and substantive bankruptcy law, no one here has disputed that Congress acted within its authority in setting up the U.S. trustee program and the bankruptcy administrator program side by side. And once you accept that it's constitutional to have two different programs, there's no apparent problem with Congress funding each program separately in accordance with the needs of each. Third, even if uniformity required these two separate programs to have exactly the same fees, well, that's that's exactly what Congress provided for here. For decades, Congress has specified that quarterly fees in bankruptcy administrator districts must be, quote, equal to those imposed, unquote, in U.S. I thought the statute says may, though. So so the the lack of uniformity would be trustee trustee districts. You have to have these higher fees now. In the non-trustee districts in Alabama and North Carolina, the the court, you know, the administrative office may the judicial courts may may impose. I mean, so the difference between mandatory and may is is a big difference, it seems. And that's what happened. They they weren't required to. So they didn't impose for the for at least the first few quarters the same fee schedule. Your Honor, we disagree that the statute is permissive rather than mandatory. But even if you think that it gives courts the option to charge no fees at all, the statute says that the bankruptcy administrator districts may charge fees equal to those imposed. And when this law was first proposed, the court said, hey, Congress, we want to charge quarterly fees. We don't have the authority to do it now. Please give us the power to do this. We want the authority to charge comparable fees. The law that Congress enacted was granted the judicial conference what it had proposed, but changed the word comparable to equal because Congress wanted fees. You know, the judicial conference said we want to charge fees. And Congress said, OK, equal fees. And I don't think anyone at the time was focused on the difference between may versus shall, honestly, because, you know, the court said we want to solve any potential uniformity problem. We want to charge fees. We lack the authority to do this. Congress, please empower us to do this. Everybody all along was thinking, you know, we're going to charge the same fees in bankruptcy administrator districts as in U.S. trustee program districts. And indeed, that's as soon as the law was enacted, the judicial conference issued an order saying fees in bankruptcy administrator districts shall be the fees in U.S. trustee program districts as those amounts may be amended from time to time. So, you know, everyone read the law for at least up until 2018 is requiring equal fees. And so even if you think, you know, there's a there's room for the judicial conference under the statute to decline to charge any fees at all. That's not what happened here. The judicial conference, the bankruptcy administrator districts charged fees in a different amount than under a six. And there's there's no way to read the text of the statute as allowing the courts to charge fees in a different amount that these have to be equal to. And just the final point I wanted to get get out there is that even if you thought there was a constitutional problem on these facts, the remedy would not be to order that the statute be ignored nationwide. The debtors in this case are essentially complaining that the statute was correctly applied to them, but it was incorrectly applied to debtors elsewhere in a way that gave certain other debtors a break. And even if that's true, that doesn't mean that these debtors are entitled to any relief under Supreme Court. The remedial question of how to restore uniformity is you look to Congress's intent as to what Congress would. I understand this argument you're making, and that's often an excuse for others or ramp it down for these debtors. But mechanically, how would that work? You're saying the bankruptcy judge in this case, in the Western District of Texas, I think it was San Antonio, could issue an order saying judges in North Carolina and Alabama, you need to start charging more fees. I mean, how does that work? I understand theoretically, but how does it work on the ground to order that remedy? The theoretical point is is the dispositive point. Nothing in the case that we cite for this Morales versus Morales-Santana, the Supreme Court recognized, look, it may it may be that the court doesn't have the right parties before it to order a particular form of relief, or it may not be appropriate for the court to itself impose the remedy that's proper. But the question is not what's easy for the court to do or what parties are before the court. The question is, what would Congress intend the uniform rule to be? And if it so happens that in this case you don't have the right parties before you or the right party, you know, the plaintiff standing to sue the party who is erroneously giving a break to someone else, that's that doesn't mean that you then, you know, order a nationwide violation of the statute. It just means that it's not appropriate to enter relief in this case. And you end up in a situation much like Morales-Santana, where the Supreme Court found a violation of the Constitution but said, I'm sorry, you know, the right answer here is to withdraw the benefit from you. Sorry, withdraw the benefit from everyone rather than extend a benefit to you. So I have one last question on uniformity, if you're going to move on to other things. What about the 2 percent? You know, there's a number of bankruptcy court decisions on this issue. I think it's the Florida decision, Mosaic, that said, well, the 2 percent that's not going to the trustee program but is going to these new bankruptcy judges is a problem, even though it otherwise agreed with your argument, because if the whole idea is, well, it's Congress can it's uniform for Congress to say those debtors and trustee districts are distinguishable and have to pay trustee fees. But why should they pay this general amount? How do you how do you respond to that? It's my response is much the same as what the SDNY court, MF Global and Sen. Edison said in response to this argument, which is, first of all, it's still a user fee. The 2 percent that's going to bankruptcy judgeships is going to the bankruptcy system. Still, you can have a user fee that funds two parts of the bankruptcy system. Second, the 18 bankruptcy judgeships that are being funded by that 2 percent, every every one of them, except for one, is in a U.S. trustee program district. So that money is still, in a sense, remaining within the U.S. trustee program districts, except for one judgeship in North Carolina, which is de minimis. And the third point is the bankruptcy administrator districts, the quarterly fees that they pay under 1937, they go into a nationwide account themselves. One hundred percent of those funds go into the judicial branches trust fund under 28 U.S.C. 1931. So, you know, if there's no problem with one hundred percent of bankruptcy administrator funds going to a nationwide account, it's not clear why there should be a problem with 2 percent of U.S. trustee program funds going into an account that in the end is basically just the money is being earmarked basically just for the U.S. trustee program district purposes. So, you know, we think there's a lot of paths to resolving the uniformity claim here. We think the simplest basis for reversal is, you know, even assuming a uniformity requirement applies. And we really don't think it does. But even assuming one applies, the statute here is uniform on its face to the extent that fees are charged at all. They have to be equal. The bankruptcy court's fundamental error below on page 6856 of the record is that the bankruptcy court thought that Congress had meant to increase fees only in the U.S. trustee program. And that's not right. But the court looks to issues more broadly than that. I hope the court will bear in mind that the Supreme Court, when it has looked at the uniformity provision, which has been pretty rarely, the only circumstance in which the Supreme Court has ever invalidated a law as non-uniform was when Congress passed a statute that said with respect to the pre-bankruptcy creditors of a particular railroad, these creditors win, those creditors lose, and the law applied to only one railroad. And the Supreme Court said, well, uniformity means that Congress can't pass private bankruptcy laws. And we're very far from that here. Everyone agrees that the fees apply uniformly within the U.S. trustee program and uniformly within the bankruptcy administrator program. We further think Congress intended to apply the same fees through both programs. And if there was a blip in the implementation of one of those fee increases, it's not a fault of Congress. And all the Constitution requires is uniform laws, not that the laws be uniformly implemented. On the so-called retroactivity issue, the bankruptcy court similarly, I think, misunderstood the analysis each step. The very first question is whether using normal principles of statutory construction, you can figure out the temporal application of the statute. And that answer is apparent here in the statute itself, an uncodified provision of the Judgeship Act of 2017. Congress said that the fee increase shall apply to quarterly fees payable under Section 1938-6 for disbursements made in any calendar quarter that begins on or after the date of enactment of this act, meaning any calendar quarter beginning on January in January 2018. Congress didn't say the fee increase would only apply to new cases. It said it would apply to quarterly fees payable for disbursements under the statute. And the statute, which is being amended, says in each case on a quarterly basis, these are the fees to apply. So the statute, we think, is clear on its face that this was intended to affect all fees based for all disbursements for all cases beginning in January 2018. And even if Congress could have been a little bit clearer, we're talking here about a prospective change in fees, not a retroactive change in fees. The debtors are complaining that if they had had a crystal ball and known a while ago that the fees were going to be increased in the future, they might have considered making some different choices. But that's that's just how business works. You know, but old country buffets might choose to open in New Orleans rather than in Metairie if it thinks that taxes are going to be lower in New Orleans than in Metairie. But then if the Orleans parish increases the property taxes, that may frustrate your expectations about the future. But the fact that you're operating under a Chapter 11 plan doesn't mean that you're exempt from from future increases in taxes or fees. I'm not sure whether this court would like me to address the cross appeal issue now, since the disbursements issue, since I'm the appellee on that. Well, you're it's up to you. You've reserved for both time. But if you want to go ahead and hit it, you've got three minutes. Yeah, I would just like to say that on this one, we think the bankruptcy court got it right. There are five other courts of appeals that have looked at this question of what is a disbursement. And they all agree that the term disbursements refers to all payments made by a debtor during a pending Chapter 11 case. And that's true regardless of the particular stage at which the Chapter 11 case has proceeded. Even debtors here agree that prior to confirmation of a plan, disbursements means all payments made by a debtor. And their theory is that once confirmation of the plan happens, there should be a different gloss given to the statute. But a single statutory subsection needs to be given a consistent meaning. And there's no difference in the statute between pre-confirmation and post-confirmation. And even if you went with debtors idea that you could somehow carve out an exception for post-confirmation, it's not clear how their theory would even work, because it seems like they would require an item by item analysis of whether a payment is more closely related to the bankruptcy or less closely related to the bankruptcy, which would turn into the kind of the kind of litigation that Congress was hoping to avoid in the first place. Congress didn't want this to be like attorney's fees where counsel had to put in detailed records of how many hours they billed and what was it spent on and are these excessive. Congress wanted a simple, easily administered rule where you have a percentage fee based on total payments by the debtor, total disbursements. So we see no reason for this court to go into conflict with its sister circuits on this question. And if there are no questions, I'm happy to reserve my remaining time in addition to the other five minutes. All right. Thank you, Mr. Sim. Just for the record, where are you in D.C.? I'm in my town home in Washington, D.C. All right. Just curious. All right, Mr. Parham, you're up. Where are you hailing from? I'm hailing from Dallas, Your Honor. All right. Just down the road from me. OK, you're up. OK, well, good morning and may it please the court. David Parham on behalf of Buffet's, we do pronounce it Buffet's here in Dallas and the company does. You know, we have four separate issues to to talk about, and the first of which is whether the statute had an impermissible retroactive effect. Secondly, whether the amendment created an unconstitutional, non-uniform scheme for charging the U.S. trustee fees. Third, whether the fees are excessive. And fourth, the disbursements issue, whether the undefined and an ambiguous term or disbursements, as courts have found, should be limited just to disbursements in the post-confirmation era, which are related to the bankruptcy. And to respond to a question just a second ago or a statement just a second ago, the quarterly report that's filed by debtors breaks out disbursements that are related to the bankruptcy and disbursements that are not. So in this case, post-confirmation, the new owners of the company were charged with basically the cost the disbursements made to buy a head of lettuce in, say, Alabama, as opposed to just being limited to payments to the creditors of the case, which they had assumed under the plan to make. I want to start with the issue of retroactivity. In this analysis, the first question, as this court stated in Margolis versus Deason, is whether or not the statute provides itself an unambiguous direction as to whether or not the statute should apply retroactively. And in making that determination, the question is whether the existence of a plausible alternative interpretation means the language could not qualify as an unambiguous expression. Langdorf similarly found that a statute must have a clear and strong statement as to its intent to operate retroactively in order for that to be to be and in fact, it can only be one interpretation. Here are two bankruptcy courts in this court, in Buffet's, I think correctly, and also the Loft Partners Court and actually Circuit City as well, have all found that the statute did not have a direction and nor was there a direction in the legislative history that would constitute a clear directive that the statute should apply retroactively. And in fact, Congress clearly knew how to do it if they had wanted to in the in the same. What's retroactive about it? I mean, it only applies to disbursements that are made after Congress passed this law. So what's how's it retroactive? Well, if you apply it to pending cases, then the temporal reach of the statute goes far back, far beyond the date where the statute was enacted, for example, in Buffet's, where the case was filed in March of 2016 and a plan was confirmed in 2017. Application of this statute would impose a significant, as the bankruptcy court found, a significant liability on transactions that had occurred in the past. In the Buffet's case, which, for example, this court found, you know, Buffet's had the fees as they were, but that the magnitude of this increase, and I think that's an important consideration, it was important to the Langdorf court. I think it was important to the Buffet's court. It was important to the Law Partners court. The magnitude of this resulted in a significant increase in liabilities for those past for those past transactions. Very similar to. I mean, let's say tomorrow. I mean, it is a lot of money. I see. I mean, I understand why this case is here and why why this is being litigated all over the country. But let's say, I mean, tomorrow Congress passes some new tax law that makes it now in retrospect, oh, the way we reorganized this company, Buffet's, didn't turn out so well. You know, if we'd known about this tax law that was coming down, we would have structured things differently. But as long as the tax law applies to things going forward, like this applies to disbursements going forward, how is that a retroactive law? Even I mean, I understand the concerns with it. Well, the question becomes, I think a threshold question becomes whether this is in fact a tax. I mean, if you look at tax cases and the law on retroactivity related to taxes, clearly that's a different standard than what is applied to other types of and not a tax. And so it makes it, for example, more similar to what happened in Lame Dwarf War, for that matter, in a case that I think is very much on point there, the Burtalis case, a 2012 U.S. Supreme Court case, which in which Burtalis was a migrant who had attained legal permanent legal residence status. He was subsequently convicted of a crime of moral turpitude, conspiracy to counter traveler's checks. But at that time, under those and in fact served a brief prison sentence at that time, even with that as a legal resident, he could leave the country temporarily. And he did frequently go back to his home in Greece. Subsequently, Congress passed the Illegal Immigration and Immigrant Responsibility Reform Act, if I said that correctly, of 1996. And in that act, it made it created a new disability for his for his prior conviction. And in particular, if he left the country even temporarily and came back, he would have to apply for readmission as an immigrant. And and the court found that the requirement that he and in fact, the conviction would be a disqualifying factor. And he was, in fact, ordered to be deported. The court found that the that this new disability, the fact that he could not leave without being readmitted, caused that statute to have a retroactive effect and that Burtalis should be judged and should be applied to him the statute as it existed at the time of this conviction. The government, interestingly enough, in that case, argued that no, it's only prospective because it only applies to future readmissions. Much as here, they're saying it only applies to future disbursements. But in fact, it there it applied. It created a disability to his prior conviction. He couldn't leave the country. And here in Buffet's, it creates a significant liability to a past transaction, which was the plan of the organization. Had we known of this fee, then things clearly would have been different in connection with the with the Buffet's plan. For example, the people who invested in Buffet's came in, they put six million dollars in cash in and executed a promissory note on behalf of the reorganized debtor for in excess of five million. Had we known we had another million dollars in U.S. trustee fees to be paid, we either would have paid less for sure or alternatively could have required the the liquidating trust to pay these fees and effectively through the plan, which is a contract on behalf of of of all the parties, including the U.S. trustee. We could have signed that liability as many cases due to the liquidating trust. So there were things that we could have done had we known of this increased fee, which was material. And again, I come back to the magnitude of the fee, which created if we were talking about, you know, a marginal adjustment such as what had happened, you know, several occasions in the past, no one would be here. But we're here because this dramatically changed the the feasibility as the bankruptcy court found it affects the feasibility, the ability of this debtor to pay a reorganized debtor to pay the ongoing priority claims, which remains today responsible for some. And so it's it is very much an issue of magnitude and there's there is no question, I think, that this statute, which was not a tax statute and shouldn't be viewed in the same vein as the tax cases, applied a significant disability or increased liability to a prior transaction. You know, I would. So, I mean, I think to recap it on the issue of retroactivity, you know, the statute does not specifically or unambiguously make it retroactive or applicable to pending cases in terms of the increase. And under the under the guise of Langdorf and Vartalos, this increase clearly had a retroactive effect as the bankruptcy court found. It also violated due process in the sense that parties should know when they enter into a transaction, you know what their what the legal landscape is. And here, obviously, it changed. It changed dramatically and at a time when we could not could not make adjustments. With respect to uniformity. I won't go through the facts. The bankruptcy court, I think, was correct in finding that the amendment created a non-uniform a non-uniform structure. The kind of go through the various arguments that the government made with respect to the bankruptcy clause argument. That argument has been made by the government in basically every case involving uniformity and it has been uniformly rejected. In the cases that we've cited in our brief, the basically the description of bankruptcy in the scope of the bankruptcy clause has been discussed through the years by the U.S. Supreme Court, and it's not subject to definition. It's expansive. And as the courts have found clearly, this is a law on the subject of bankruptcies. It relates to payment of the U.S. trustee fee and the U.S. trustee and funding of the U.S. trustee, an entity that only operates in bankruptcy. The statute was not mandatory in terms of the requirement for or any kind of a requirement for the VA districts to charge a similar fee. And in fact, Congress did not, when it amended the statute in 1997, in 2017 or 18 rather, 17 rather, did not address the VA districts or modify A7 at all. Clearly, the the judicial conference did not view it as mandatory. And in fact, to this day, the statute is non-uniform in the sense that the when they finally did adopt the same fee structure for VA districts as exist in the U.S. trustee districts, it only applied, they only applied it to cases filed on or after October 1, 2018. So for any case that was filed before October 1, 2018 in a U.S. trustee district, those debtors are still paying higher fees than debtors in VA districts are paying who file cases in the same time frame. So the law, it was not only not uniform when it was enacted, the amendment, but even today, the system is not uniform with respect to the charges to debtors in U.S. trustee and VA districts. The argument that the government's made that it applies similarly to legislature. I'll follow up on that point because I think I'm a little confused now. You say it's not the same today. I thought this quarter, let's say, you know, 2020, the next quarter that these get assessed, I thought now it is the same. It is the same if a case was filed after October 1, 2018. They made it based on case only cases being filed. So you're saying if it's a case that was filed before then in a VA district, you'd still have a different result? Correct. Okay. If the phase had been filed in Alabama, for example, in March of 2016, the phase would be paying a lower fee than what the phase is paying now. And, you know, the geographic discrimination can be seen in, as the court in Circuit City pointed out, that Circuit City filed their case only 140 miles to the South in Raleigh, North Carolina, then they would have always paid a lower fee than what they're having to pay in the U.S. trustee district, which is why the Circuit City Court also struck this statute down as unconstitutionally non-uniform. I do want to address briefly the issue about the question or the argument that's been raised that the fees, because they're charged in all the U.S. trustee districts, therefore are uniform. That whole line of thought goes back to the Blanchett case, the Railroad Act cases, but in those cases, which they had a statute that applied just to Midwest regions, so it was a regional act, but all the railroads that were impacted were in that region. And so what the Supreme Court found in Blanchett was that all debtors in the U.S. were treated similarly because all of them were in that region that statute applied to. Similarly, all creditors of debtors in the United States for those railroads were treated the same because they would bring their claims under the act that was passed for the railroad restructuring. So in Blanchett, while it was a regional statute, it in fact covered all debtors, all similarly situated debtors in the United States, and all creditors were treated the same who had claims against those railroads. That's not the case here. In order to determine whether there's geographic discrimination, you have to look at the class of debtors involved, and here the class has to be all debtors, the bankruptcy code applies to all debtors, and all debtors are not treated equally. The fact is that debtors in U.S. trustee districts are charged a substantially higher rate fee during this period of time we're talking about than were debtors in the B.A. trustee districts, and even as the government conceded in its briefs when it talked about the facts that trigger what triggers this fee is that it's the filing of a case and the incurrence of disbursements that exceed $1 million. So what we have is a system that as this court found, the bankruptcy court found, is non-uniform in that debtors in 88 districts, or in all districts, pay a substantially higher rate than the debtors in the other districts, and there's been no, there's no suggestion in the legislative history that this was intended to impact simply a problem that existed in North Carolina or Alabama or alternatively a problem that simply existed in the other districts. The final point I would make is, because we're just funding the U.S. trustee system here, that the, its actions can only be considered as irrational and arbitrary. Moving briefly to the takings and excess fees, with my minute and a half left, argument, if the fees had been in place from the time that this case was raised, bankruptcy case, had been in effect throughout the entire case, the U.S. trustee would have charged more than either the debtor and his professionals charged or the unsecured creditors committee and its benefits provided. Here the creation of this fund obviously is a charge far in excess of what, of what the cost of the fees provided are. As the court noted, the 2%, these monies, although the statute was supposed to just direct money to the U.S. trustee fee, 2% goes to the general fund, and in addition, these fees go to cover functions of the U.S. trustee, such as the, such as Chapter 7 and Chapter 13 cases, which have nothing to do with the U.S. trustee fee. In Massachusetts, it is on point, talking about where the user fee goes to other purposes. In that case, it was ferry passengers versus the fees we used for the Port Authority. Then that fee is unconstitutional as excessive. So our view is this is excessive and unconstitutional. All right. There is, Judge Acosta, you ready? We lost you a minute ago. You there? Yeah. I don't know what happened. I was losing you all, but I'm back. I think we're good. Sorry about that. Well, it's like Houston. We have a problem. The SpaceX caused it, no doubt, at any event. Go ahead. Start the clock. All right, Mr. Sandberg, you're on. Thank you, Your Honor. I'd be happy to answer questions about anything in particular that's on the judge's mind. I do have a few points to make in response to Mr. Parham as well. First on retroactivity, I think the argument that my opposing colleague was laying out was exactly the line of reasoning that the Supreme Court in Landgraf rejected, which is just because something, just because a law is applied in a pending case doesn't make it retroactive. I think there's a sentence in Landgraf that says almost exactly that. The question is what is the predicate for the, what is the conduct that the law is operating on? So in Vartelis, the other case that my opposing colleague was talking about, there was a new consequence imposed on a criminal conviction that had happened in the past. And that consequence was you could no longer travel outside the country and come back in. And the Supreme Court said that was a disability put on your prior criminal conviction rather than on anything you might do in the future. If the fact that you traveled outside the country, the government there had argued, yes, you're traveling outside the country in the future, that's a prospective change. But no, the thing that the statute was operating on was the fact of your prior criminal conviction. Here, the thing that the statute is operating on is your future disbursements. If you don't make any future disbursements, you don't have to pay any future fees except for the minimal amount that the statute calls for. So the change in fees to be paid here is prospective under the reasoning of Landgraf. I don't see any difference between user fees or tax in the retroactivity analysis. I think Mr. Parham was suggesting that maybe because it's a user fee, the statutory analysis should be different. But with respect, I don't think that there's any rule of statutory construction that says existing users of a government service don't have to pay a fee increase unless Congress says existing users of this program or service also have to pay the fee. Normally, if there's any sort of grandfathering out of new requirements, that would be done expressly. On just the magnitude of the fee increase generally, my opposing colleague is quite right that this was a significant increase for debtors. That is because taxpayers were all of a sudden on the hook for funding federal bankruptcy administration. And that has been contrary to Congress's longstanding policy. Congress wants the bankruptcy system to be funded by bankruptcy users rather than taxpayers. And by applying the fee increase to all pending cases, you actually are spreading the cost of the program out more. What I think my opposing colleague is suggesting is that, you know, you should exempt if it's such a big fee increase, you should exempt all of the current cases. Well, that would just impose an even more crushing burden on the newly filed cases in order to make up the difference in funding in the program. In any event, there's a rational basis for Congress's choice here. Congress set up a reserve, wanted to set up a reserve amount for the U.S. trustee program. The reserve it picked as relevant to this case was 200 million dollars. That's still less than the annual cost of the U.S. trustee program. There's nothing irrational about Congress wanting to have a small safety net of funding on hand so that you wouldn't have to dip into taxpayer funds. On uniformity, I think my opposing colleague's reasoning suggests that because there was a difference in how the law was applied here, that there's a uniformity problem and it's unconstitutional. But it can't be that just because a court 150 miles down the road would apply a different fee or a different rule of law, that that means the law is unconstitutional. I mean, there are multiple bankruptcy cases at the Supreme Court each term because there's a circuit split. The Fifth Circuit thinks the bankruptcy code provision means X and the Sixth Circuit thinks it means not X. And the bankruptcy code is unconstitutional because courts have disagreed about what it meant. So to hear the fact that Congress provided on the face of A6 and A7 of Section 1930 for the same fees to apply everywhere. And if there's been a blip in how that was implemented in particular districts, that's a unconstitutional. My opposing colleague is right that most courts that have considered the subject of bankruptcies issue have ruled against the government. Respectfully, those courts didn't engage in the kind of careful appellate style analysis of the question that we think is appropriate. The courts have mostly relied on the fact that the Supreme Court has said the bankruptcy clause should be interpreted broadly. It's not limited to what bankruptcy meant in the 1700s. It can extend beyond traders. It can benefit debtors and not just creditors. The point of all those cases is that Congress has broad power to both set up a bankruptcy system and to impose a uniform substantive bankruptcy law. And so it would be sort of perverse to read the Supreme Court statements about the breadth of Congress's power as somehow limiting Congress and its ability to set up the machinery of the bankruptcy system. And again, I don't think Buffet disputes that Congress can have a bankruptcy appellate panel, but the 1st, 6th, 8th, 9th and 10th can choose to do so. There are local rules in each bankruptcy. There's the U.S. trustee program and a bankruptcy administrator program, which I don't think Buffet has objected to their coexistence. So I see that I've run out of my time. If there are any questions, I'm happy to answer them. Otherwise, we rest on our briefs. All right. Thank you, counsel. Mr. Sandberg and Mr. Parham, we appreciate your briefing on this matter as well as the supplemental information that's presented. We've got a full packet here, so the case will be submitted and we'll get it decided.